UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JONATHON EDICK,

                    Petitioner,

v.

MICHAEL BURGESS,

                    Respondent.

_____/

Case No. 1:20-cv-828

Honorable Robert J. Jonker

## OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Jonathon L. Edick is incarcerated with the Michigan Department of Corrections at the Oaks Correctional Facility (ECF) in Manistee, Manistee County, Michigan. On October 13, 2016, following a three-day jury trial in the Kalamazoo County Circuit Court, Petitioner was convicted of the following four offenses: first-degree home invasion, in violation of Mich. Comp. Laws § 750.110a(2); third-degree criminal sexual conduct (CSC–III), in violation of Mich. Comp. Laws § 750.520d(1)(b) (force or coercion); unlawful imprisonment, in violation of Mich. Comp. Laws § 750.349b; and domestic violence, in violation of Mich. Comp. Laws § 750.81(2). On November 21, 2016, the court sentenced Petitioner as a fourth-offense habitual offender under Mich. Comp. Laws § 769.12 to a mandatory minimum of 25 years' incarceration and a maximum of 50 years' incarceration for each of the four convictions.

On August 28, 2020, Petitioner filed his initial habeas corpus petition, raising four grounds for relief. (ECF No. 1.) Petitioner indicated that he had exhausted his fourth ground for relief but acknowledged that he had not exhausted his first three grounds. In an opinion and order (ECF Nos.

3 and 4) entered on September 9, 2020, the Court dismissed without prejudice Petitioner's unexhausted grounds for relief, stayed his exhausted ground, and administratively closed this matter until Petitioner filed a timely motion to amend his habeas petition to include any subsequently exhausted claims.

On October 5, 2022, Petitioner returned to this Court with a motion to lift the stay and amend his petition for habeas corpus. (ECF No. 5.) In an order (ECF No. 6) entered on December 5, 2022, the Court granted Petitioner's motion and directed the filing of his amended petition (ECF No. 7). In his amended petition, Petitioner asserts the following three grounds for relief:

I.      Petitioner was denied Due Process and effective assistance of counsel guaranteed under both state and federal constitutions, by trial counsel's failure to investigate and discover material impeachment evidence in the preparation of his pre-trial motion and hearing, to bar introduction of prior uncharged act[s] under MRE 404(b), and to effectively prepare for trial, denying Petitioner's right to present a substantial defense and a fundamentally fair trial.

II.     The prosecution violated Petitioner's right to Due Process and a fair trial when they withheld material impeachment evidence that discredited key witness [JP], and as a result of the suppression the prosecution deliberately misrepresented the truth surrounding why Petitioner was never charged in the prior act allegations made by [JP].

III.    Appellate counsel was Constitutionally ineffective for failing to raise Grounds I-II.

(Am. Pet., ECF No. 7, PageID.136.) Respondent asserts that Petitioner's grounds for relief lack merit.[1] (ECF No. 10.) For the following reasons, the Court concludes that Petitioner has failed to

---

[1] Respondent also contends that grounds I and II are procedurally defaulted. (ECF No. 10, PageID.319–320.) Respondent does recognize, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural

set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

## Discussion

### I.   Factual Allegations

The Michigan Court of Appeals described the events underlying Petitioner's convictions as follows:

> [Petitioner's] convictions arise out of a home invasion and sexual assault of [Petitioner's] former girlfriend, MV, on February 22, 2016. MV testified that the relationship ended on February 17, 2016. During the days after the breakup, [Petitioner] and MV communicated by cellular telephone and a messenger application called Hangout. MV explained that [Petitioner] sent her threatening messages and made a phone call in which he threatened to kill her and her three children; [Petitioner] also threatened to ruin MV's life and break her possessions. MV asked Officer Adam Dmoch, an acquaintance, questions about personal protection orders (PPO), and Officer Dmoch informed MV that she should report all threats to the proper authorities.
>
> MV testified that during the evening hours of February 22, 2016, she received text messages from [Petitioner] asking her what she was doing and whether she invited another man into her home. MV responded "no" and indicated that she wanted to be left alone. MV testified that after she was in bed, she heard a noise from a window in the kitchen area of her apartment. MV got out of bed and walked toward the kitchen; [Petitioner] entered the apartment through a window. He ignored MV when she told him to leave. [Petitioner] proceeded to walk upstairs and look in each of the bedrooms and bathroom. MV testified that [Petitioner] used his body to "grab" her; she described the physical contact as "kind of like a big hug but my arms were down." MV explained that her arms were pinned to her sides and that [Petitioner] lifted her up and "walked me into my bedroom in his arms into my bedroom and laid me down on my bed." [Petitioner] laid MV on the bed "with his body," and he initially lay on top of MV. MV said that she struggled to get [Petitioner] off her; she told [Petitioner] to "stop," and she asked him to leave. At some point, MV and [Petitioner] were lying side-by-side on the bed, but [Petitioner] continued to hold MV down with his arms, and he used his leg to hold her lower body down.

---

default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix,* 520 U.S. at 525*; Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

3

MV testified that although [Petitioner] repeatedly asked her to have sex with him, she refused and said "no" and "not interested" 10 or 15 times. MV explained that [Petitioner] began to forcefully remove her clothes and also his own. MV stated that she eventually "just gave in" and was unable to get up or get away from [Petitioner]. MV testified that she felt trapped and if she tried to move, "he'd grab me." Defendant was "hovering over" MV, and he forced his penis into her vagina for about 8–10 minutes until he ejaculated. After [Petitioner] was finished, he got up and left the apartment. On cross-examination, MV testified that [Petitioner] also performed cunnilingus on her.

MV testified that she did not contact the police immediately after the assault out of concern that Child Protective Services (CPS) would become involved because her children were present in the home at the time of the assault. MV agreed that CPS previously became involved following an assault that [Petitioner] perpetrated against her in 2014. Specifically, MV testified that on one occasion while she was driving her vehicle and [Petitioner] was a passenger. While she and [Petitioner] were involved in a disagreement, [Petitioner] reached over and pulled her hair, punched her in the arm, and tried to grab the steering wheel.

On February 25, 2016, MV went to the sheriff's department with her sister to report the incident. Deputy Jeremy Kline completed a report, but MV only reported that [Petitioner] made threatening telephone calls; she did not report an assault or a home invasion. MV explained that she did not report the assault or home invasion to Deputy Kline because his demeanor was "cold," and he kept "shutting me down."

On Monday, February 29, 2016, MV disclosed the assault to a coworker who escorted her to the YWCA where she reported the assault to staff and then to Deputy Juan Johnson. Deputy Johnson went to MV's apartment and observed a fingerprint on a window at the apartment; it appeared as if someone tampered with the window and "popped it from the track."

The trial court admitted other-acts evidence at trial. Specifically, JP, [Petitioner's] former wife, testified about an incident in which [Petitioner] entered her home unannounced and physically assaulted her. JP testified that after the divorce, on the morning of May 6, 2013, when [Petitioner] and JP were no longer living together, [Petitioner] appeared at JP's home near her bedroom window. [Petitioner] entered JP's home through the side door. [Petitioner] instructed JP's young child to go into a bedroom, and then he forced JP into her bedroom. JP testified that [Petitioner] "pinned" her onto her bed and tried to convince her to have sex, but she refused. [Petitioner] pulled JP's pants down to her ankles, but he ultimately stopped and left the home.

[Petitioner] testified in his own defense and denied that he assaulted MV. Instead, according to [Petitioner], he and MV were still in a relationship, MV invited him over to her apartment, and then they had consensual sex.

*People v. Edick*, No. 335966, 2018 WL 910171, at *1–2 (Mich. Ct. App. Feb. 15, 2018).

4

Prior to trial, the State filed notices of its intent to introduce other acts evidence pursuant to Michigan Rule of Evidence 404(b) and Michigan Court Rule 768.27b. (ECF No. 11-1, PageID.407.) Petitioner, through counsel, filed a motion in limine seeking to bar such evidence. (*Id.*) The trial court conducted an evidentiary hearing regarding those filings on September 1, 2016. (ECF No. 11-5.) At the evidentiary hearing, the State presented testimony from JP, the 404(b) witness. JP testified that she was Petitioner's ex-wife. (*Id.*, PageID.560.) JP testified regarding two instances of domestic violence that Petitioner committed during their marriage, both of which led to convictions. (*Id.*, PageID.561–566.)

JP indicated that she and Petitioner were officially divorced on April 11, 2013. (*Id.*, PageID.566.) She testified that in May of 2023, an incident occurred that led to her calling the police regarding Petitioner. (*Id.*) JP noted that the incident occurred "right after [she] had been put on probation for something separate regarding [her] criminal background." (*Id.*) JP testified that on the date in question, she and Petitioner had been text messaging regarding their children when, before JP "knew it," Petitioner came in the side door of her house without her permission. (*Id.*, PageID.567.) JP testified that Petitioner "tried to rip [her] pants off of [her] and have sex—asked [her] to have sex with him.' (*Id.*) JP stated that she and Petitioner "had been discussing a criminal case between the two of us for a home invasion, and [she] had been asking him to quit lying and drop the charges." (*Id.*)

JP noted that "nothing physical—sexually physical ever ended up happening." (*Id.*, PageID.568.) She testified that she "just remember[ed] [Petitioner] wanting [her] to have sex with him and grabbing [her] computer and trying to put pornography on again and pinning [her] down."

(*Id.*, PageID.570.) JP testified that Petitioner eventually gave up after she made it clear that she did not want to have sex with him. (*Id.*, PageID.571.)

When questioned by Petitioner's counsel, JP noted that she contacted the police about the incident, but that "it never went anywhere." (*Id.*, PageID.575.) She acknowledged that at the time of the incident, Petitioner had filed charges against her, and that those charges were still pending. (*Id.*) JP clarified that the charges against her had been filed in February or March of 2013. (*Id.*, PageID.576.)

The trial court concluded the evidentiary hearing on September 23, 2016. (ECF No. 11-6.) The trial court determined that the evidence presented by JP regarding Petitioner's past behavior was "highly relevant to the issue in this case." (*Id.*, PageID.650.) The trial court also noted that "the prior acts of abuse are unquestionably probative for the prosecution to show [Petitioner's] character for assaulting his domestic partner and his propensity to commit acts of violence." (*Id.*) With respect to 404(b) evidence—namely, the prior alleged act of sexual assault against JP—the court noted that the State had "met the test of showing a relevant non-propensity rationale." (*Id.*, PageID.661.) Specifically, the court indicated that the "striking similarities of the other act evidence, despite the few differences, assist the government in rebutting [Petitioner's] claim that the behavior toward [MV] . . . was a consensual sexual act." (*Id.*) The court, therefore, orally denied Petitioner's motion in limine to bar the 404(b) other-acts evidence. (*Id.*, PageID.664.)

Jury selection for Petitioner's trial occurred on October 11, 2016. (Trial Tr. I, ECF No. 11-7.) Over the course of two days, the jury heard testimony from MV, MV's sisters, Officer Dmoch, the coworker who escorted MV to the YWCA, the YWCA's victim advocate counselor, Sergeant Johnson, JP, Detective McGehee, Deputy Kline, a friend of Petitioner's, one of Petitioner's former girlfriends, one of Petitioner's coworkers, Petitioner's mother, Petitioner's grandmother, and

6

Petitioner himself. (Trial Tr. I and II, ECF Nos. 11-7 and 11-8.) On October 13, 2016, after about five hours of deliberation, the jury reached a guilty verdict. (Trial Tr. III, ECF No. 11-9, PageID.1216.) Petitioner appeared before the trial court for sentencing on November 21, 2016. (ECF No. 11-10.)

Petitioner, with the assistance of counsel, appealed his convictions and sentences to the Michigan Court of Appeals. Petitioner raised the following issues in his counseled brief: (1) the trial court erred in imposing a mandatory 25–year minimum sentence under Mich. Comp. Laws § 769.12(1)(a); (2) the trial court erred in the scoring of Offense Variables (OVs) 8, 10, and 11; (3) trial counsel was ineffective for failing to challenge JP's testimony; and (4) trial counsel was ineffective for failing to object to the 25-year mandatory minimum. (ECF No. 11-15, PageID. 1389-1390.)

Petitioner also filed a *pro per* supplemental brief, asserting the following issues: (1) the prosecutor engaged in misconduct during voir dire by "manipulating the trier of facts' logic and/or emotions and manipulating their perception of reasonable doubt"; (2) the prosecution committed misconduct by suppressing exculpatory evidence; (3) the prosecution did not file the habitual offender enhancement notice within the allotted time frame for doing so; (4) trial counsel was ineffective for failing to impeach JP; (5) the trial court abused its discretion by allowing the admission of police reports from May 2023 and September 2014; (6) trial counsel was ineffective by failing to submit police reports into evidence, failing to impeach MV, and failing to object to inconsistent statements; (7) trial counsel was ineffective for failing to impeach Sergeant Johnson; (8) the prosecution presented perjured testimony from Sergeant Johnson and MV; and (9) trial counsel was ineffective for failing to subpoena MV's phone records and enter emails into evidence. (*Id.*, PageID.1426–1450.)

In an opinion entered on February 15, 2018, the court of appeals affirmed Petitioner's convictions and sentences. *Edick*, 2018 WL 910171, at *1. The Michigan Supreme Court denied Petitioner's application for leave to appeal on October 30, 2018. *See People v. Edick*, 919 N.W.2d 259 (Mich. 2018). The United States Supreme Court denied Petitioner's petition for a writ of certiorari on October 7, 2019. *See Edick v. Michigan*, 140 S. Ct. 193 (2019).

As noted *supra*, Petitioner filed his initial § 2254 petition in this Court on August 28, 2020. (ECF No. 1.) In an opinion and order (ECF Nos. 3 and 4) entered on September 9, 2020, the Court dismissed without prejudice Petitioner's unexhausted grounds for relief, stayed his exhausted grounds, and administratively closed this matter until Petitioner filed a timely motion to amend his habeas petition to include any subsequently exhausted claims. Petitioner subsequently filed a motion for relief from judgment, pursuant to Michigan Court Rule 6.500, in the Kalamazoo County Circuit Court on October 8, 2020. (ECF Nos. 11-11 and 11-12.) The trial court denied Petitioner's motion on February 3, 2021. (ECF No. 11-14.) The Michigan Court of Appeals and Michigan Supreme Court denied Petitioner's applications for leave to appeal on April 6, 2022, and October 4, 2022, respectively. (ECF No. 11-16, PageID.1515; ECF No. 11-18, PageID.1696.) This amended § 2254 petition followed.

## II.    Request for an Evidentiary Hearing

As a fourth ground for relief, Petitioner contends that this Court should hold an evidentiary hearing. (Am. Pet., ECF No. 7, PageID.136.) Generally, habeas corpus actions are determined on the basis of the record made in the state court. *See* Rule 8, Rules Governing § 2254 Cases. The presentation of new evidence at an evidentiary hearing in the district court is not mandatory unless one of the circumstances listed in 28 U.S.C. § 2254(e)(2) is present. *See Sanders v. Freeman*, 221 F.3d 846, 852 (6th Cir. 2000). The Sixth Circuit Court of Appeals recently reviewed the requirements of the statute:

As the Supreme Court recently recognized, [the Antiterrorism and Effective Death Penalty Act] "restricts the ability of a federal habeas court to develop and consider new evidence." *Shoop* [*v. Twyford*], 142 S. Ct. [2037,] 2043 [(2022)]. Specifically, the statute allows the development of new evidence in "two quite limited situations": (1) when the claim relies on a "new" and "previously unavailable" "rule of constitutional law" made retroactive by the Supreme Court, or (2) when the claim relies on a "factual predicate that could not have been previously discovered through the exercise of due diligence." *Id*. at 2044 (quoting 28 U.S.C. § 2254(e)(2)). And even if a prisoner can satisfy either of those exceptions, to obtain an evidentiary hearing, he still must show by "clear and convincing evidence" that "no reasonable factfinder" would have convicted him of the crime charged. *Shinn* [*v. Ramirez*], 142 S. Ct. [1718,] 1734 [(2022)] (quoting 28 U.S.C. § 2245(e)(2)(A)(i), (ii)). Mammone does not purport to satisfy any of these stringent requirements for obtaining discovery or an evidentiary hearing: he does not rely on a new rule of constitutional law, he does not contend that the factual predicate for his constitutional claims could not have been previously discovered, and he points to no clear and convincing evidence that would cast doubt on the jury's verdict.

*Mammone v. Jenkins*, 49 F.4th 1026, 1058–59 (6th Cir. 2022).

Petitioner, like Mammone, does not rely upon any new rule of constitutional law, nor does his claim rely on a factual predicate that could not have been previously discovered through the exercise of due diligence. Moreover, even if Petitioner cleared those hurdles, he does not show by any evidence, much less clear and convincing evidence, that no reasonable factfinder would have convicted him. Under these circumstances, there is no basis to hold an evidentiary hearing. Accordingly, Petitioner's request for a hearing, characterized as a fourth ground for relief, will be denied.[2]

---

[2] To the extent that Petitioner contends that the trial court erred by not holding an evidentiary hearing regarding Petitioner's claims of ineffective assistance, such a claim is not cognizable on federal habeas review. *See Simpson v. Jones*, 238 F.3d 399, 406–07 (6th Cir. 2000) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Smith v. Phillips*, 455 U.S. 209, 221 (1982)). In addition, "the Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citing *Kirby v. Dutton*, 794 F.2d 245, 246–47 (6th Cir. 1986); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002)). "[T]he traditional function of the writ is to secure release from illegal custody," *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973), but a due process claim with respect to post-conviction proceedings, even if resolved in Petitioner's favor, would not impact Petitioner's custody. In reviewing such a claim, the Court "would not be reviewing any matter directly pertaining to" that custody. *Cress*, 484 F.3d at 853 (quoting *Kirby*, 794 F.2d at 247). If this Court were to conclude

### III.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in

that the trial court erred in denying Petitioner an evidentiary hearing, Petitioner would not automatically be released from custody or be granted a new trial.

light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate

courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## IV.    Discussion

### A.    Ground II—Prosecutorial Misconduct

Petitioner's second ground for relief contends that the prosecution violated his due process rights by withholding "material impeachment evidence that discredited key witness [JP], and as a result of the suppression the prosecution deliberately misrepresented the truth surrounding why Petitioner was never charged in the prior act allegations made by [JP]." (Am. Pet., ECF No. 7, PageID.136.) Specifically, Petitioner faults the prosecution for violating *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding documentation suggesting that Petitioner was not criminally charged following the May 2013 incident with JP because of a conclusion that Petitioner's version

of events was "more plausible" than JP's. (Br. Supp. Am. Pet., ECF No. 8, PageID.159.) Petitioner also faults the prosecution for requesting that the jury not be permitted to hear that Petitioner was not charged following the May 2013 incident and omitting the fact that Petitioner's version of events was found to be more plausible. (*Id.*, PageID.161.) According to Petitioner, the prosecution misrepresented the reason why Petitioner was not charged, leading to the trial court sustaining the prosecution's request. (*Id.*) Petitioner suggests that he did not learn about the charging decision until July of 2019, when he obtained a copy of the prosecution file regarding the May 2013 incident, and that the file included a document concerning a request by JP for a second opinion for denying charges against Petitioner. (*Id.*, PageID.150.)

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court should consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner. *See United States v. Young*, 470 U.S. 1, 11–12 (1985). The Supreme Court has described the *Darden* standard as "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012). The *Parker* Court rejected an attempt to graft any additional requirements on the "very general" *Darden* standard.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487,

512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. 637, 645). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (internal quotation marks omitted).

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. There are three components to finding a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Prejudice (and materiality) is established by a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469–70 (2009). A reasonable probability equates to a "probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

Both the court of appeals and the trial court addressed Petitioner's allegations regarding the withholding of exculpatory evidence. On direct appeal, Petitioner argued that "the prosecutor denied him due process by withholding exculpatory evidence in an effort to admit other-acts

14

evidence under MRE 404(b)." *Edick*, 2018 WL 910171, at *8. The court of appeals rejected his

claim, stating:

> [Petitioner's] argument concerns the May 6, 2013 incident involving JP when, according to JP, [Petitioner] entered her home without permission and physically forced her into her bedroom and tried to have sex with her. [Petitioner] contends that there is an inconsistency in the police report involving that incident and JP's testimony at the pretrial evidentiary hearing. In particular, the responding officer reported that, "I checked her clothing and found no rips or any sign of forced removal," whereas JP testified at the evidentiary hearing that she recalled telling [Petitioner], "you're ripping my pants," and that she heard her pants ripping.
>
> This inconsistency, if any, does not amount to a *Brady* violation or any other misconduct. There is nothing in the record to support that the prosecution withheld the police report or that [Petitioner] did not have access to the report in time for the evidentiary hearing. Regarding the inconsistency between the testimony and the report, we note that the prosecutor did not attempt to hide the inconsistency, and [Petitioner] was free to impeach JP at the hearing and at trial. *See, e.g.*, *People v. Parker*, 230 Mich. App. 677, 690; 584 N.W.2d 753 (1998) (rejecting claim of prosecutorial misconduct when while there were some discrepancies in the testimony of the prosecutor's witnesses, the prosecutor did not attempt to conceal the contradictions).
>
> [Petitioner] also contends that the police report of the May 6, 2013, incident indicated that the responding officer observed text messages on [Petitioner's] phone and that the officer indicated "those text messages have been saved . . . ." [Petitioner] contends that had the prosecutor not suppressed these text messages, then the trial court would have excluded JP's testimony.
>
> Defendant's argument fails for several reasons. First, nothing in the record shows that the officer preserved the text messages as [Petitioner] alleges or that the prosecution possessed the messages as of 2016. [Petitioner] had access to the police report, and he could have inquired about the status of the text messages, but there is no indication that he did so. Second, nothing supports that the text messages would have had any impact in this case. [Petitioner] does not cite any legal authority to support that the trial court would have suppressed JP's testimony about other acts had the text messages been introduced into evidence. Rather, [Petitioner] could have impeached JP's testimony on the basis of the police report alone. [Petitioner] has failed to show that the prosecutor suppressed evidence or engaged in any other misconduct related to JP's testimony.

*Id.* at *8–9.

Petitioner asserted his prosecutorial misconduct claim regarding the charging decisions concerning the May 2013 incident in his Rule 6.500 motion. The trial court rejected his claim, stating:

> [Petitioner] raises three claims relating to information that he recently became aware of regarding the government's denial of charges stemming from the May 6, 2013 assault reported by [JP]. He submits that these contentions warrant relief under MCR 6.508(D)(2).

> [Petitioner] argues that the trial prosecutor committed misconduct by: (1) withholding material impeachment evidence that would have discredited [JP] and this concealment violates *Brady v. Maryland*, 373 U.S. 83, 87 (1963); (2) engaging in misconduct when she suppressed the "real reason" for not charging [Petitioner] for actions occurring on May 6, 2013; and (3) misleading this court during the pretrial evidentiary hearing and that his trial counsel was ineffective for never requesting a copy of the Plaintiff's file or the warrant denial. This court does not agree.

> While [Petitioner's] claims appear to be based on newly discovered evidence and therefore may survive procedural bars under MCR 6.508(D)(2) and (3)(a), the court finds that [Petitioner] mischaracterizes the value of this information and improperly inflates its significance and the [e]ffect it would have on his convictions. As such, the court holds that [Petitioner] has failed to establish the prerequisite "actual prejudice" for success under MCR 6.508(D)(3)(b).

> A review of the record indicates that the government's attorney neither withheld exculpatory or impeachment evidence, nor misled this court. Additionally, the rationale for why the government chose not to file criminal charges against [Petitioner] from May, 2013 behavior is immaterial to the court's unrelated decision to permit [JP] to testify concerning other acts evidence under MRE 404(b). Charging considerations are likely to include, but are certainly not limited to: the substantial burden of proof and likelihood of securing a conviction, 5th Amendment factors, conflicts in testimony, as well as the availability of supportive witnesses or corroborating physical evidence. The government enjoys the authority and immense discretion in choosing to charge someone with a crime. That charging decision is a separate and distinct question from whether a trial court might allow testimony that surrounds that same illegal conduct to be admitted under MRE 404(b). [Petitioner's] "newly discovered evidence," i.e., the government's appraisal about the viability of a conviction involving a May, 2013 incident between [Petitioner] and [JP], does not purport to question [JP's] credibility and would be inconsequential to this court's determination of the admissibility of her testimony under MRE 404(b).

> The government considerations and evaluations at the charging stage are not subject to disclosure under *Brady*, *supra*, when evidence of [Petitioner's] conduct is

considered for purposes of admissibility under MRE 404(b). At trial, the jury's directive was to measure all of the witnesses' credibility, including [JP's], and not to ruminate over the several possible rationales that may have led the government not to charge [Petitioner] with a crime.

Finally, even if the jury would have been provided evidence of the government decision not to charge [Petitioner] from his May, 2013 behavior, the court finds that it would not have affected the outcome of the trial. In the instant case, [Petitioner's] trial counsel was able to impeach [JP] on a number of accounts, yet the jury still convicted [Petitioner] of the multiple crimes against [MV]. The evidence confirming [Petitioner's] illegal entry and sexual assault of [MV] was substantial and was supported by evidence of his prior assault upon her, his threatening phone call to her, and his compelling text messages to her in the days leading up to the assault. Therefore, even if [Petitioner] can overcome the "good cause" requirement of MCR 6.508(D)(3)(a), he has failed to establish "actual prejudice" under subparagraph (D)(3)(b). Furthermore, this court finds that such new evidence would not render a different probable result on retrial nor create a "significant possibility of actual innocence." MCR 6.508(D)(2).

(ECF No. 11-14, PageID.1341–1343.)

Petitioner has attached a copy of the charging decision, as well as the police reports from the May 6, 2013 incident, to his brief supporting his amended habeas petition. During the investigation, JP gave the following statement to law enforcement:

[JP] in summary told me that she is divorced from [Petitioner], that her divorce was final on April 11th. She said that today she was in her residence, in her rear bedroom, and that her one sliding window has no screen, and was open, when suddenly her ex-husband, [Petitioner], poked his head through the window and started a conversation. She said they had a short conversation, and then the next thing, he came in through the side door of the residence, and came into the home uninvited. She said that [Petitioner] pushed her into the bedroom, pushed her down on the bed and "tried to rip my clothes off." She said that he partially pulled down her sweat pants and that she could hear the seams start to pop, however they were not torn. She said that he was able to get the pants down to or near her ankles. She said that while he was yanking down her pants she said, "Dude you're ripping my pants, stop." I asked her where her children were. She said the youngest was in the crib and the other was in his room. She said that during this time he kept telling her if you have sex with me, I will drop the charges. She told me that at no time did he ever touch her private areas and that he did not expose himself or remove any of his clothing. She then through that part of the statement, said that at one point he got on her laptop computer, which is on a bed stand near the bed, to pull up some lesbian porn. I asked her how he did this, if he was trying to disrobe her. She said like, he was on top of me, and reached over and operated the computer. She said that it finally ended with nothing further of him walking out, in her words, normally,

and kissing the kids goodbye. She told me she wants to press charges for entering her home.

(ECF No. 8, PageID.186.) During the interview, JP acknowledged being "out on bond" for home invasion charges involving Petitioner as the complainant. (*Id.*) The officer noted that during the interview, JP "showed no emotion and did not seem upset about this incident." (*Id.*)

The police report also memorialized an interview with Petitioner regarding the May 6, 2023, incident:

> I was able to make telephone contact with [Petitioner] at 11:17 am. He responded to the Kalamazoo Township Police Department to speak to me in reference to this incident. [Petitioner] was informed that he was not under arrest and he was free to go. He agreed to speak to me about the incident. [Petitioner] told me about the past history where his ex-wife had broken into his home and she was on bond on charges through Kalamazoo city for home invasion. [Petitioner] went on to tell me that he has been out of town, just got back into town, and that his ex-wife had texted him, and that deep down he still loves her and does wish to possibly get back together with her. He said that he did have contact over the last couple of days through text and call and that she invited him over so he went over there this morning, driving his girlfriend's white vehicle. He said that he arrived at the residence, the front window was open, he hollered in. She said I'm in the back, so he walked around to the back and proceeded to have a conversation with her through the window at which time, she asked him if he was going to come in or not, and she let him in the side door of the residence. She said that once inside, they talked at one point she went to the bathroom, pulling her pants down and using the bathroom in front of him, without closing the door. He said that the conversation turned to him calling the prosecutor and getting the charges dropped against her, and she hinted towards them having, "lesbian sex." He explained to me that this is a foreplay that they have done in the past where they play lesbian sex videos, while he has oral sex with her. He said that she took off her pants while he was on the computer looking up lesbian pornography, he said that again, the conversation turned to him dropping the charges and he got into a discussion with her, in summary saying that he could not do that, it was in the hands of the court. He said that he never got unclothed, he never touched any of her private areas, he did touch her face. He said that when he realized things weren't going good, he tried to get off of the bed a couple times, and she pulled him back closer. He said that they were hugging and he explained this was the last time he was going to try to be with her. It ended with him getting up, giving his kids a hug and a kiss, and leaving.

(*Id.*, PageID.187.) During the interview, Petitioner showed his phone to the officer so that the officer could see text messages between him and JP. (*Id.*) In sum, those messages were a

"conversation at length back and forth about getting back together, their relationship being ruined, some accusations of being unfaithful, etc. and comments about false charges and getting charges dropped." (*Id.*, PageID.187–188.) The police report also indicates that Petitioner took a polygraph regarding the incident on May 30, 2023. (*Id.*, PageID.193.) The results of the polygraph were inconclusive. (*Id.*)

Following the investigation, the police report was forwarded to the Kalamazoo County Prosecuting Attorney's office for review. (*Id.*, PageID.194.) On June 11, 2013, the investigating officer learned that the prosecutor's office had denied a warrant on all charges. (*Id.*, PageID.195.)

Shortly thereafter, JP requested a second opinion regarding the decision to not charge Petitioner with a crime based on the events of May 6, 2013. (*Id.*, PageID.181.) Chief Assistant Prosecuting Attorney Carrie Klein responded, indicating that she was not authorizing charges because she did not "feel there is sufficient admissible evidence to present a reasonable probability of conviction." (*Id.*) Specifically, Klein stated:

> In this case I do not find any abuse of discretion on the part of the first assistant prosecutor who reviewed the case. In fact, based upon my reading of the complaint I feel that she properly exercised her discretion and reached the proper charging decision. Based on the admissible evidence available it is not possible to prove all elements of the alleged offenses beyond a reasonable doubt. You and [Petitioner] give different versions of your encounter on May 6, 2013. There are no other witnesses who are capable of testifying in court who can verify one version over the other. There is no physical evidence which can verify one version over the other. Given this there is no way to prove beyond a reasonable doubt that any crime was committed.

(*Id.*, PageID.181–182.) This "citizen's appeal" document also included the following statement supporting the decision to not press charges: "In addition, suspect's version of events presents as more plausible explanation of what occurred than [JP's] version of events, making these even more difficult to prove." (*Id.*, PageID.181.)

Petitioner offers nothing to indicate that either the court of appeals or the trial court strayed from clearly established federal law in rejecting his prosecutorial misconduct claims. Petitioner merely continues to reiterate his assertion that the prosecutor violated *Brady* by not turning over a copy of the "citizens appeal" regarding the decision to not pursue charges arising out of the May 6, 2013 incident.

Petitioner's concern regarding the citizen's appeal document is ***not*** the decision to not charge Petitioner—a decision that was known to Petitioner and expressly considered during the Rule 404(b) admissibility hearing. Nor is Petitioner's focus the prosecutor's innocuous determination that the presentation of uncorroborated and inconsistent "he said/she said" testimony is not likely to cross the threshold of guilt beyond a reasonable doubt. That, too, was discussed at the hearing. Rather, Petitioner claims he was wronged by the prosecutor's failure to reveal that she thought Petitioner's version was the "more plausible explanation." (*Id*.)

The trial court concluded that the prosecutor's decision "d[id] not purport to question [JP's] credibility . . . ." (ECF No. 11-14, PageID.1343.) This Court must presume that factual determination is correct; although Petitioner may overcome it with clear and convincing evidence.

Accepting the trial court's determination as correct, Petitioner cannot show that the failure to turn over the citizen's appeal decision is material under *Brady*. Petitioner insists that the prosecutor's "more plausible explanation" conclusion is a statement regarding JP's credibility. Indeed, his entire argument is premised on that proposition. But he does not offer any evidence to support that proposition, clear and convincing or otherwise. Even accepting Petitioner's proposition as true, however, would not change the result.

If the prosecutor's "more plausible explanation" conclusion is a statement attacking JP's credibility, there would be no way for Petitioner to present the prosecutor's conclusion to the jury. "[I]t is improper for a witness to comment or provide an opinion on the credibility of another witness since matters of credibility are to be determined by the trier of fact." *People v. Buckey*, 378 N.W.2d 432, 439 (Mich. 1985) (quoting the opinion of the Michigan Court of Appeals decision under review, *People v. Buckey*, 348 N.W.2d 53 (Mich. Ct. App. 1984)). That general prohibition stands whether the credibility opinion is offered directly as testimony at trial—the type of opinion testimony at issue in *Buckey*—or offered as an unsworn out-of-court statement offered in evidence to prove the truth of the matter asserted. *See, i.e.*, *People v. Mussser*, 835 N.W.2d 319 (Mich. 2013).

"[E]vidence is 'material' under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a 'reasonable probability' that had the evidence been disclosed the result of the trial could have been different." *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995) (citing *Kyles v. Whitley*, 514 U.S. 419, 433–434 (1995)). Therefore, "withheld information is material under *Brady* only if it would have been admissible at trial or would have led directly to admissible evidence." *Gumm v. Mitchell*, 775 F.3d 345, 363 (6th Cir. 2014). Although Petitioner contends admission of the prosecutor's opinion might well have affected the result, he offers no theory that might allow admission of the opinion.

Moreover, Petitioner does not suggest that the disclosure of the prosecutor's opinion would have led directly to any other admissible evidence. Petitioner was already aware of the facts that prompted that opinion, the facts disclosed in the police report.[3] Petitioner's argument makes clear

---

[3]Notably, the May 2013 police report was provided to Petitioner and his counsel during pretrial discovery. Moreover, Petitioner himself was aware of the alleged inconsistencies set forth in the police report, as well as the text messages that he exchanged with JP around the time of the

that the prosecutor's opinion was the end of the inquiry, not the first step on an exploration for other admissible evidence.

In sum, Petitioner has failed to demonstrate that any prosecutorial misconduct occurred premised upon the alleged withholding of the "citizens appeal" charging decision. Moreover, Petitioner has failed to demonstrate that the charging decision was material and would have changed the outcome of his trial. Because Petitioner has not shown that the state courts' determinations regarding his prosecutorial misconduct claim are contrary to, or unreasonable applications of, clearly established federal law, Petitioner is not entitled to relief with respect to habeas ground II.

### B.      Grounds I and III—Ineffective Assistance of Trial and Appellate Counsel

As his first ground for relief, Petitioner contends that trial counsel rendered ineffective assistance by "fail[ing] to investigate and discover material impeachment evidence in the preparation of his pre-trial motion and hearing, to bar introduction of prior uncharged act[s] under MRE 404(b), and to effectively prepare for trial." (Am. Pet., ECF No. 7, PageID.136.) As his third ground for relief, Petitioner faults appellate counsel for not raising what Petitioner asserts as habeas grounds I and II. (*Id.*)

---

incident. Indeed, during cross-examination of JP, Petitioner's counsel elicited the fact that the May 6, 2023, incident occurred after Petitioner had filed a complaint "about some type of home invasion charge" against JP. (Trial Tr. II, ECF No. 11-8, PageID.1006.) JP also admitted that Petitioner had filed Child Protective Services (CPS) complaints against her. (*Id.*, PageID.1007.) By eliciting that information on cross-examination, counsel presented facts from which the jury could possibly infer that JP had motive to not be truthful about what had occurred between her and Petitioner on May 6, 2013. Indeed, during closing arguments, counsel pointed out that JP had "raised those allegations after [Petitioner had] already filed charges or a complaint against her for home invasion or breaking into his property." (Trial Tr. III, ECF No. 11-9, PageID.1172.) Counsel argued that "for [him] to say that [JP's] testimony is suspect is an understatement." (*Id.*)

1.      **Standard of Review**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The *Strickland* standard that applies to trial counsel also applies to appellate counsel. However, a criminal appellant has no constitutional right to have every non-frivolous issue raised on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme

Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential", per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Moreover, scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d). In light of that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised ineffective assistance of counsel claims as part of his direct appeal and in his Rule 6.500 motion. On direct appeal, the court of appeals set forth the following standard to address Petitioner's claims:

> To establish ineffective assistance of counsel, a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v. Trakhtenberg*, 493 Mich. 38, 51; 826 N.W.2d 136 (2012). "A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694; 104 S. Ct. 2052; 80 L. Ed. 2d 674 (1984).

*Edick*, 2018 WL 910171, at *4. The trial court set forth the following standard:

> To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) that his attorney's performance was below an objective standard o[f] reasonableness in light of prevailing professional norms; and (2) that he was prejudiced by the deficient performance, i.e., a reasonable probability exists that the outcome would have been different, absent counsel's unprofessional conduct. *People v. Sabin (On Second Remand)*, 242 Mich. App. 656, 659 (2000).

(ECF No. 11-14, PageID.1339.) Both *Trackhtenberg* and *Sabin* identify *Strickland* as the source of the standard. *See Trackhtenberg*, 826 N.W.2d at 143; *Sabin*, 620 N.W.2d at 22. Thus, there is no question that the state courts applied the correct standard.

The state courts' application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe

25

> such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the state courts applied the correct standard. Petitioner can only overcome the deference afforded state court decisions if the determination regarding Petitioner's ineffective assistance claims is an unreasonable application of *Strickland* or if the state courts' resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d). The Court, therefore, will consider whether the state courts reasonably applied the standard for Petitioner's claims of ineffective assistance of counsel.

### 2.    Ground I—Ineffective Assistance of Trial Counsel

As his first ground for relief, Petitioner faults trial counsel for not "investigat[ing] and discover[ing] material impeachment evidence in the preparation of his pre-trial motion and hearing, to bar introduction of a prior uncharged act under MRE 404(b), and to effectively prepare for trial." (Am. Pet., ECF No. 7, PageID.136.) Petitioner contends that he had informed counsel about the allegations made by JP regarding the May 6, 2013 incident, but that he was never charged as a result. (Br. Supp. Am. Pet., ECF No. 8, PageID.148.) Petitioner also told counsel that he had provided the investigating officer with text messages suggesting that JP was lying about the incident. (*Id.*) Petitioner "insisted that counsel must investigate and obtain the text messages[] and police reports of the burglary charge and her arrest for violating her bond condition." (*Id.*) According to Petitioner, counsel failed to do so. (*Id.*) Petitioner also contends that counsel's motion in limine regarding the 404(b) evidence was "ill prepared, devoid of substance and law, [and] a clear indication of counsel's failure to investigate." (*Id.*, PageID.149.) Petitioner further suggests that if counsel had conducted a "bare minimum investigation," he would have discovered the "citizens appeal" charging decision discussed *supra*. (*Id.*, PageID.151.)

Petitioner asserted his ineffective assistance claims regarding counsel's handling of JP's

testimony on both direct appeal and in his Rule 6.500 motion. Both courts rejected his assertions.

Specifically, the court of appeals stated:

> [Petitioner] argues that defense counsel was ineffective during the pretrial evidentiary hearing when the trial court considered whether to admit JP's testimony concerning [Petitioner's] other bad acts. [Petitioner] argues that counsel failed to adequately challenge JP's credibility at the evidentiary hearing. [Petitioner] notes that he took and passed a polygraph and that both JP and MV were friends, "each with an axe to grind."
>
> Initially, we note that the "bright-line rule that evidence relating to a polygraph examination is inadmissible is well established." *People v. Jones*, 468 Mich. 345, 355; 662 N.W.2d 376 (2003). [Petitioner] therefore cannot show that counsel acted deficiently in failing to introduce evidence of a polygraph exam during the evidentiary hearing. *See People v. Ericksen*, 288 Mich. App. 192, 201; 793 N.W.2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").
>
> With respect to counsel's cross-examination of JP, we reiterate that "[d]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v. Davis*, 250 Mich. App. 357, 368; 649 N.W.2d 94 (2002). At the hearing in this case, defense counsel cross-examined JP regarding the nature of her relationship with [Petitioner], asked about whether JP had a relationship with MV, and questioned JP regarding whether there were charges pending against JP on the date that [Petitioner] entered her apartment and physically assaulted her. Defense counsel also questioned JP about whether she discussed the pending charges against [Petitioner]. In doing so, defense counsel challenged the admissibility of JP's testimony in a manner that he deemed most appropriate, and we will not second-guess counsel's choice regarding the most effective line of questioning. *See id.*
>
> * * *
>
> Next, in a Standard 4 brief, [Petitioner] argues multiple claims of ineffective assistance of counsel. In Standard 4 Issue IV, [Petitioner] argues that counsel was ineffective when he failed to impeach and failed to subpoena JP's probation officer "to testify to her multiple violations for [harassing] defendant." [Petitioner] also contends that counsel should have introduced a prior police report or a conviction against JP.
>
> "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy."

*Davis*, 250 Mich. App. at 368. In this case, as discussed above, defense counsel's questioning of JP at the evidentiary hearing did not amount to deficient performance. Similarly, defense counsel's cross-examination at trial did not amount to deficient performance. Counsel questioned JP about the criminal complaint that [Petitioner] filed against her for home invasion, and JP agreed that she was prosecuted for the home invasion. JP also agreed CPS became involved with her at some point. Thus, defense counsel apprised the jury that JP had charges pending against her at the time of the incident involving [Petitioner] and that JP was involved with CPS at the time. Thus, introduction of the police report or an official conviction would have merely been duplicative evidence because JP admitted that she was prosecuted for the home invasion. Counsel's cross-examination was not deficient.

[Petitioner's] argument that defense counsel should have called JP's probation officer to testify about incidents where JP allegedly harassed [Petitioner], also lacks merit. Counsel failing to call a witness may be ineffective assistance when it denies the defendant a substantial defense, one that might have resulted in a different outcome at trial. *People v. Payne*, 285 Mich. App. 181, 190; 774 N.W.2d 714 (2009); *People v. Kelly*, 186 Mich. App. 524, 526; 465 N.W.2d 569 (1990).

In this case, [Petitioner] cannot show that failure to call JP's probation officer was outcome determinative. [Petitioner] does not attach affidavits to indicate what the proposed testimony would be; however, even assuming that the officer would have testified that JP previously harassed [Petitioner], such testimony would not have amounted to a defense that likely would have made a difference in the outcome of the trial. Specifically, defense counsel's cross-examination of JP showed that she and [Petitioner] had a tumultuous relationship, and JP admitted that she was prosecuted for an incident involving home invasion of [Petitioner's] home. JP also admitted that she was involved with CPS and that there were CPS complaints filed against her. Thus, the jury was aware that JP had a bad relationship with [Petitioner], and defense counsel effectively advanced the defense theory that JP had motive to lie about defendant. Testimony of the probation officer would not have substantially advanced this defense theory, and [Petitioner] therefore cannot show that failure to call the officer denied him a substantial defense or amounted to deficient performance. *See Payne*, 285 Mich. App. at 190. [Petitioner] has failed to overcome the presumption that defense counsel's strategy involving JP fell below an objective standard of reasonableness. *See Davis*, 250 Mich. App. at 368–369.

*Edick*, 2018 WL 910171, at *4–5.

After obtaining the "citizens appeal" charging decision, Petitioner asserted what he raises as habeas ground I in his Rule 6.500 motion. The trial court denied his claim, stating:

[Petitioner] argues that he is entitled to a new trial because his trial attorney failed to conduct an exhaustive investigation to unearth information he could have used

to impeach [Petitioner's] ex-wife, [JP], who testified at trial. During the trial, the government offered [JP's] testimony concerning other acts to corroborate the complainant's testimony, through MCL 768.27b and MRE 404(b).[] [Petitioner] claims a comprehensive investigation would have revealed: (1) various arrests between [JP] and himself that could show she has a history of lying to law enforcement about [Petitioner]; (2) [JP's] violation of personal protection orders around the time she claimed [Petitioner] entered her home uninvited and tried to sexually assault her; (3) [JP's] troubles with Child Protective Services (CPS) and that she lost custody of her children; and (4) [Petitioner] and [JP] exchanged a string of text messages around this time that would illustrate that [JP] was lying. [Petitioner] maintains that his trial attorney made no effort to investigate any of this information or evidence [Petitioner] made known to him. [Petitioner] also faults his appellate attorney for failing to raise these deficiencies on direct appeal. In this court's opinion, [Petitioner] did not receive ineffective assistance of trial or appellate counsel.

The record reflects that [Petitioner's] trial counsel interrogated [JP] during the pretrial evidentiary hearing about charges that were pending against her that had been filed by [Petitioner]. His trial counsel then cross-examined [JP] during the trial regarding the same, as well as the open CPS cases. Trial counsel also explored the point that [Petitioner] had filed some of the complaints, testified against her, and was seeking custody of her children.[] Trial counsel then obtained the testimony of [Petitioner's] mother that [JP] and the instant complainant, [MV], were good friends at one time.[] Furthermore, when [Petitioner] testified on his own behalf, his trial counsel elicited from him that CPS removed their children from [JP's] care and awarded him full custody.[] On appeal, appellate counsel asserted that trial counsel was ineffective for failing to challenge the reliability of the MCR 404(b) evidence during the pretrial motion hearing.[] Additionally, appellate counsel maintained that no charges were ever filed against [Petitioner] involving [JP] and that [JP and MV] had become friends who held an "axe to grind" against [Petitioner]. In an effort to shed light on [JP's] truthfulness, appellate counsel also submitted that [JP] was upset because [Petitioner] refused to drop criminal home invasion charges he had reported against [JP] earlier.

The Court of Appeals rejected each of the claims of ineffective assistance of trial counsel raised—by appellate counsel and separately by [Petitioner[--and held that [Petitioner] had failed to overcome the presumption that defense counsel's strategy involving [JP] fell below an objective standard of reasonableness.[] Consequently, [Petitioner's] claims in this post-conviction motion were either already decided against him by the appellate court or could have been raised in that direct appeal. Furthermore, it is readily apparent by reviewing [Petitioner's] arguments on appeal and his supporting attachments that [Petitioner] was completely aware of the police reports and how to obtain copies and electronic communications between him and [JP]. Therefore, [Petitioner] had the pertinent information available and should have raised any additional claims he may have had against his trial attorney in his direct appeal.

(ECF No. 11-14, PageID.1339–1341 (footnotes omitted).) As discussed *supra*, the trial court also concluded that the newly discovered evidence—i.e., the "citizens appeal" charging decision regarding the May 6, 2013, incident—was not material and that Petitioner had "mischaracterize[d] the value of this information and improperly inflate[d] its significance and the [e]ffect it would have on his convictions." (*Id.*, PageID.1342.) Notably, the trial court concluded that such evidence would not have affected the outcome of Petitioner's trial. (*Id.*, PageID.1343.)

### a.     Text Messages and Bond Violation

Petitioner faults counsel for not introducing text messages that were exchanged between Petitioner and JP, as well as reports regarding JP's violation of her bond, during his trial. Petitioner asserts that the text messages show that JP "was trying to get back together" with Petitioner, not the other way around. (Br. Supp. Am. Pet., ECF No. 8, PageID.153.) Petitioner suggests that these text messages would have shown that JP's testimony at his trial was not credible. (*Id.*) Petitioner states further that the bond violation reports "are evidence that [he] made complaints of [JP] harassing him in violation of court orders." (*Id.*)

Petitioner has attached copies of the text messages in question to his brief. Notably, during his exchange with JP, JP mentioned that they could "be a family again" when Petitioner decided to "dismiss [her] fake charges." (*Id.*, PageID.198.) JP also wrote that her "heart has never left but [Petitioner's] actions pushed [her]." (*Id.*) She also stated that Petitioner should remember that he "had the choice and [he] chose wrong." (*Id.*) However, nowhere in those messages did JP directly state that she wanted to get back together with Petitioner.

Petitioner has also attached the bond violation reports to his brief. Those reports indicate that as part of her bond, JP was to have no contact, whether directly or indirectly, with Petitioner. (*Id.*, PageID.217.) According to the report, JP had called and texted Petitioner numerous times in violation of her bond. (*Id.*) Most of the calls were regarding "him dropping the charges against her

so they can now become a family." (*Id.*) The report indicates that JP was arrested for violating her bond. (*Id.*)

Another report noted that JP violated her bond by having contact with Petitioner in a parking lot on May 21, 2013. (*Id.*, PageID.222.) According to the report, Petitioner was to meet a CPS worker at a McDonalds "to take custody of the children." (*Id.*) He was not aware that JP would be present as well. (*Id.*) When Petitioner arrived, he met the CPS worker and learned that JP would be bringing the children. (*Id.*) When JP arrived, Petitioner tried to keep his distance. (*Id.*) JP, however, "'glared' at him and made comments such as, 'this is bullshit.'" (*Id.*)

In his federal habeas proceedings, Petitioner merely reiterates the arguments that he raised—and that were rejected—in the state courts. Petitioner simply fails to demonstrate that introduction of these text messages and bond violation reports would have affected the outcome of his trial. As the court of appeals noted, defense counsel thoroughly cross-examined JP about her relationship with Petitioner, which made the jury aware that "JP had a bad relationship with [Petitioner]." *Edick*, 2018 WL 910171, at *5. Moreover, through that cross-examination, defense counsel "effectively advanced the defense theory that JP had motive to lie about [Petitioner]." (*Id.*) The trial court reiterated these determinations in its opinion denying Petitioner's Rule 6.500 motion. (ECF No. 11-14, PageID.1339–1341 (footnotes omitted).) Given counsel's cross-examination of JP, any use of the text messages and bond violation reports simply would have been cumulative, and counsel cannot be deemed ineffective for failing to present cumulative evidence. *See Robins v. Fortner*, 698 F.3d 317, 330 (6th Cir. 2012). The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel's pursuit of it was professionally unreasonable. Petitioner, therefore, is not entitled to habeas relief with respect to this assertion of ineffective assistance.

### b.   "Citizens Appeal" Charging Decision

As thoroughly discussed *supra*, Petitioner has not demonstrated that the evidence he believes was withheld—i.e, the "citizens appeal" charging decision—was material to the outcome of his trial. *See supra* Part IV.A. Nor has Petitioner demonstrated that the outcome would have been different had counsel obtained that decision and been able to introduce it during trial. The Sixth Circuit has "held that *Strickland*'s 'reasonably-likely' prejudice standard is the same as *Brady*'s prejudice standard." *Chinn v. Warden, Chillicothe Corr. Inst.*, 24 F.4th 1096, 1102–03 (6th Cir. 2022) (citing *Montgomery v. Bobby*, 654 F.3d 668, 679 n.4 (6th Cir. 2011) (en banc)); *see also Strickland*, 466 U.S. at 694 (noting that "the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution"). In light of this Court's determination that such evidence was not material to the outcome of Petitioner's trial, this Court must conclude that Petitioner has not demonstrated prejudice from counsel's alleged failure to further challenge JP's testimony by using this evidence. Accordingly, Petitioner is not entitled to habeas relief with respect to this assertion of ineffective assistance of counsel.

In sum, Petitioner has not demonstrated that the state courts' rejection of his ineffective assistance of trial counsel claim is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief with respect to habeas ground I.

### 3.   Ground III—Ineffective Assistance of Appellate Counsel

As his third ground for relief, Petitioner faults appellate counsel for failing to raise what he sets forth as habeas grounds I and II. (Am. Pet., ECF No. 7, PageID.136.) Petitioner contends that these grounds are stronger than the issues counsel chose to raise on direct appeal. (Br. Supp. Am. Pet., ECF No. 8, PageID.163.)

The trial court summarily rejected Petitioner's claim in its opinion denying his Rule 6.500 motion. (ECF No. 11-14, PageID.1341.) As thoroughly discussed *supra*, grounds I and II lack merit. Accordingly, appellate counsel's failure to raise such claims "on direct appeal cannot be deemed constitutionally deficient performance." *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003); *see also Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("If trial counsel performed adequately, our inquiry is at an end; by definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."). Petitioner has not demonstrated that the trial court's rejection of his ineffective assistance of appellate counsel claim is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief with respect to habeas ground III.

## V.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v.*

*Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## <u>Conclusion</u>

The Court will enter a judgment denying the petition, as well as an order denying Petitioner's request for an evidentiary hearing and a certificate of appealability.

Dated:      <u>January 30, 2024</u>              <u>/s/ Robert J. Jonker</u>
                                               Robert J. Jonker
                                               United States District Judge

34